UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:22-cv-274-MOC

| | |
|---|---|
| JILL KRANTZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| KILOLO KIJAKAZI, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER** is before the Court on the parties' opposing Motions for Summary Judgment. (Doc. Nos. 13, 17). Plaintiff brought this action, pursuant to 42 U.S.C. § 405(g), for review of Defendant's final administrative decision denying her claim for supplemental security income ("SSI") under title XVI of the Social Security Act. Having carefully considered such motions and reviewed the pleadings, the Court enters the following findings, conclusions, and Order.

**FINDINGS AND CONCLUSIONS**

**I.     Facts and Background**

On February 26, 2020, Plaintiff filed a claim for SSI benefits under Title XVI of the Act, alleging disability since October 1, 2019, due to PTSD, depression, anxiety, eating disorder, Ehlers Danlos Syndrome, orthostatic hypertension, dysautonomia, and irritable bowel syndrome. (Tr. 16, 192, 212). Plaintiff's claim was denied initially and upon reconsideration. (Tr. 89, 101). On September 22, 2021, Plaintiff waived her right to appear at an ALJ hearing. (Tr. 179). The ALJ held a hearing on October 4, 2021, at which Plaintiff's counsel appeared, and a vocational expert testified. (Tr. 32–43). On October 20, 2021, the ALJ issued an unfavorable decision

denying Plaintiff's claim. (Tr. 14–26). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision for judicial review. (Tr. 1–6). This appeal followed.

## II. Factual Background

The Court adopts and incorporates the ALJ's findings herein as if fully set forth. Such findings are referenced in the substantive discussion which follows.

## III. Standard of Review

The only issues on review are whether the Commissioner applied the correct legal standards and whether the Commissioner's decision is supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 390 (1971); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Review by a federal court is not de novo, Smith v. Schwieker, 795 F.2d 343, 345 (4th Cir. 1986); rather, inquiry is limited to whether there was "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Perales, 402 U.S. at 401 (internal citations omitted). Even if the Court were to find that a preponderance of the evidence weighed against the Commissioner's decision, the Commissioner's decision would have to be affirmed if it was supported by substantial evidence. Hays, 907 F.2d at 1456. The Fourth Circuit has explained substantial evidence review as follows:

> the district court reviews the record to ensure that the ALJ's factual findings are supported by substantial evidence and that its legal findings are free of error. If the reviewing court decides that the ALJ's decision is not supported by substantial evidence, it may affirm, modify, or reverse the ALJ's ruling with or without remanding the cause for a rehearing. A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence. If the reviewing court has no way of evaluating the basis for the ALJ's decision, then the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013) (internal citations and quotations omitted).

## IV. Substantial Evidence

### a. Introduction

The Court has reviewed the transcript of Plaintiff's administrative hearing, the decision of the ALJ, and the relevant exhibits contained in the extensive administrative record. The issue is whether the decision of the ALJ is supported by substantial evidence, not whether the Court might have reached a different conclusion had it been presented with the same testimony and evidentiary materials. For the following reasons, the Court finds that the ALJ's decision was supported by substantial evidence.

### b. Sequential Evaluation

A five-step process, known as "sequential" review, is used by the Commissioner in determining whether a Social Security claimant is disabled. The Commissioner evaluates a disability claim pursuant to the following five-step analysis:

a. An individual who is working and engaging in substantial gainful activity ("SGA") will not be found to be "disabled" regardless of medical findings;

b. An individual who does not have a "severe impairment" will not be found to be disabled;

c. If an individual is not working and is suffering from a severe impairment that meets the durational requirement and that "meets or equals a listed impairment in Appendix 1" of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors;

d. If, upon determining residual functional capacity, the Commissioner finds that an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made;

e. If an individual's residual functional capacity precludes the performance of past work, other factors including age, education, and past work experience must be considered to determine if other work can be performed.

20 C.F.R. § 416.920(a)–(f). The burden of proof and production during the first four steps of the inquiry rests on the claimant. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995). At the fifth step, the burden shifts to the Commissioner to show that other work exists in the national economy that the claimant can perform. Id.

### c. The Administrative Decision

The ALJ followed the five-step sequential evaluation in his analysis of Plaintiff's alleged disability. See 20 C.F.R. § 416.920(a). In particular, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity from her application date of February 26, 2020, through October 20, 2021, the date of the ALJ's decision. (Tr. 16). At step two, the ALJ found that Plaintiff had the following medically determinable and severe impairments: tachycardia syndrome; Ehlers-Danlos syndrome; anxiety; depression; and PTSD. (Tr. 16–17). The ALJ found at step three that, during the relevant period, none of Plaintiff's impairments, nor any combination thereof, met or medically equaled one of the conditions in the Listing of Impairments at 20 C.F.R. Pt. 404, Subpt. P, App'x 1. (Tr. 17–19).

Before proceeding to step four, the ALJ found that Plaintiff had the RFC to perform a range of light work—with additional limitations—during the relevant period.[1] (Tr. 19–24).

---

[1] A claimant's RFC is the most that he can do despite his functional limitations. 20 C.F.R. § 416.945(a). The RFC assessment is an administrative finding that the ALJ alone is responsible for crafting, and he does so by considering all the relevant medical and other evidence in the record, 20 C.F.R. § 416.945(a)(3). In assessing a claimant's RFC, the ALJ must independently analyze the relevant evidence and develop an RFC based upon that evidence. 20 C.F.R. § 416.945.

The ALJ found at step four that Plaintiff was unable to perform any past relevant work. (Tr. 24). At step five, however, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 25–26). Thus, the ALJ found that Plaintiff was not disabled within the meaning of the Act. (Tr. 26).

**V.        Discussion**

Plaintiff raises only one assignment of error. She argues that the ALJ did not articulate his reasons for finding as not persuasive Dr. Reddick's medical opinions in a July 2020 letter that Dr. Reddick submitted in support of Plaintiff's waiver of appearance at her hearing. For the following reasons, the Court disagrees.

The Court first notes that, relevant to Plaintiff's sole assignment of error here, the record before the ALJ showed that, about once every two to three months, psychiatrist Brad Reddick treated Plaintiff for depression, anxiety, post-traumatic stress disorder ("PTSD"), and an eating disorder. (Tr. 404–11, 487–90, 528–31). His treatment included counseling, therapy, and managing Plaintiff's medications. (Id.). Moreover, Plaintiff reported seeking inpatient treatment for her eating disorder before the relevant period. (Tr. 458).

Dr. Reddick's examinations regularly showed Plaintiff had a depressed and anxious affect and abnormal thoughts related to her body image and eating disorder. (Tr. 408, 409, 529, 530). Nevertheless, during the relevant period Plaintiff's weight improved to a healthy weight range. (Tr. 404, 406, 465, 472, 530).[2]

---

[2] The Centers for Disease Control and Prevention considers a body mass index (BMI) in the range of 18.5 to 24.9 to be within the healthy range for an adult. See Centers for Disease Control and Prevention, "Healthy Weight, Nutrition, and Physical Activity," available at https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html (last visited April 11, 2023). For Plaintiff, Dr. Reddick measured her to be underweight in October 2019 (105 pounds, BMI 16.4); in April 2021, she was within the healthy range (118 pounds, BMI 18.5); at an

-5-

Case 3:22-cv-00274-MOC   Document 18   Filed 06/09/23   Page 5 of 16

Despite Plaintiff's issues with depression, anxiety, and negative body image, Dr. Reddick's treatment notes consistently show that Plaintiff's examinations were otherwise normal, with normal speech, associations, thought processes, age-appropriate judgment, and insight; and normal memory, attention, concentration, and fund of knowledge (Tr. 404–11, 487–90, 529–31).

Over time, Plaintiff's reported symptoms fluctuated. For example, in August 2021, Plaintiff reported increased symptoms. (Tr. 528). And at two appointments, after Plaintiff reported passive suicidal thoughts, Dr. Reddick made medication adjustments (Tr. 529, 531). By contrast, Plaintiff reported feeling "much improved" following a ketamine infusion in March 2020, and she was "better and emotionally more stable" in November 2020. (Tr. 404, 487). Dr. Reddick predominantly prescribed Effexor and Vraylar and adjusted the dosages to treat Plaintiff's symptoms, but he also tried other medications. (Tr. 404–11, 487–90, 528–31).

Dr. Reddick did not offer his medical opinions in a formal assessment. Instead, he authored two letters discussing Plaintiff's mental health and treatment. First, he wrote a February 14, 2020, letter generally endorsing Plaintiff to be considered for an emotional support animal. He believed an emotional support animal would help prevent post-traumatic exacerbations, detect emotional and anxiety triggers, and enable Plaintiff to make progress with her treatment. (Tr. 407).

Second, he wrote a letter dated July 14, 2020, which accompanied Plaintiff's submission of a waiver of her appearance at the ALJ hearing in September 2021. (Tr. 179–81, 184–86, 407). Dr. Reddick stated in his July 2020 letter that "Mrs. Krantz's condition or confluence of different

---

October 2020 appointment, she weighed 120 pounds; at her consultative examination, she weighed 122 pounds. (Tr. 406, 465, 472, 530).

-6-

Case 3:22-cv-00274-MOC   Document 18   Filed 06/09/23   Page 6 of 16

conditions is among the most pronounced, difficult to treat, and overwhelming I have seen in my practice over the last 25 years." (Tr. 185). In support of this statement, Dr. Reddick discussed Plaintiff's treatment. (Tr. 185). While he noted Plaintiff had "tried without success numerous residential treatment facilities," the only evidence in the record is that Plaintiff sought residential treatment for her eating disorder before the relevant period. (Tr. 185, 458). There is no record evidence of any hospitalization for depression, anxiety, or PTSD. (Tr. 458). Dr. Reddick also stated in the letter that Plaintiff had received intensive psychotherapy of many different varieties. The record shows, however, that she only received an hour-long therapy session with Dr. Reddick once every two to three months during the relevant period. (Tr. 185, 404–11, 487–90, 528–31). Dr. Reddick also stated in the letter that ketamine treatment had not been successful. However, in the only discussion of the ketamine treatment in Dr. Reddick's notes, Plaintiff reported she was "much improved" after treatment. (Tr. 185, 404).

Dr. Reddick wrote that Plaintiff had anxiety stemming from PTSD associated with an assault that occurred early in her life. (Tr. 184). Dr. Reddick continued with a series of broad statements suggesting dissociation and extreme symptoms. For example, he said that Plaintiff's impairments resulted in "unpredictable and intense anxiety that will often cause her to disassociate and be out of touch with the present," and that the anxiety was "exacerbated by recurrent depression which is severe and often accompanied by suicidal thinking and complete withdrawal, shutting down entirely." (Tr. 184). He also stated that Plaintiff's dissociation symptoms, anxiety, and emotional dips would make consistent attendance at work "impossible." (Tr. 185). In addition, he stated that Plaintiff's fluctuating emotional state and dissociative symptoms would make "laying down long-term memory from short-term memory very difficult if not impossible." (Id.). Dr. Reddick also noted that Plaintiff's dissociation "takes her entirely

away from the present moment and she misses broad swaths of time and crucial information," which would make "sustained concentration and endurance impossible." (Id.).

Contrary to these statements regarding dissociation, Dr. Reddick's treatment notes during the relevant period repeatedly found Plaintiff's behavior, associations, speech, thought processes, memory, fund of knowledge, attention, concentration, judgment, and insight to be normal. In limited instances, Plaintiff was noted to be distracted, (Tr. 487, 488, 490); and at one appointment, she exhibited slowed thought process and decreased short term memory, (Tr. 404).

Nothing in Dr. Reddick's treatment notes, however, memorializes, discusses, or even suggests the extreme dissociative symptoms set forth in Dr. Reddick's July 2020 letter. (Tr. 404–11, 487–90, 528–31). In fact, at the June 2020 appointment that most immediately preceded Dr. Reddick's July 2020 letter, Dr. Reddick's examination showed Plaintiff's mood and affect was anxious and depressed, but the following were normal: her appearance, speech, motor/behavior, thought processes and content, attention and concentration, memory, judgment, and insight. (Tr. 489). Despite Dr. Reddick's opinions, his therapy sessions with Plaintiff never increased in frequency, and there is never any discussion of additional interventions, such as hospitalization.

In August 2020, Plaintiff attended a consultative psychological examination with Chad C. Ritterspach, Psy.D. (Tr. 458–61). Plaintiff reported she lived with her parents and her daily activities included reading, listening to music, and texting; she was able to perform self-care, but not as often as she would like; she could prepare simple meals using the microwave; she could shop online occasionally; she was not driving as much as in the past due to anxiety and migraines; she could do some housework; and she socialized with her boyfriend and her family. (Tr. 459). Dr. Ritterspach found Plaintiff to be pleasant, engaged, and articulate. (Tr. 459). She was moderately anxious and depressed, but she denied hallucinations and suicidal ideation. (Tr.

459). Her thought processes were found to be logical, and her thought content was appropriate. (Tr. 459).

Based on his examination, Dr. Ritterspach opined that Plaintiff was mildly impaired in understanding, retaining, and following instructions; mildly to moderately impaired in sustaining attention to perform simple repetitive tasks; moderately to significantly impaired in relating to others; and significantly impaired in tolerating stress and pressure associated with work activity. (Tr. 460). Plaintiff's prognosis was fair for an ability to work in the future. (Tr. 459).

Two state agency psychological consultants also reviewed the evidence. (Tr. 71–88, 90–100). Nancy Y. Herrera, Ph.D. found Plaintiff could sustain sufficient attention to complete simple, routine, repetitive tasks for two-hour periods at a non-production pace and accept direction from a supervisor and maintain adequate working relationships with co-workers. (Tr. 85–86). Jacquelyn A. Harrison, Ph.D. generally agreed with Dr. Herrera's opinion.

Based on this and other record evidence, the ALJ found that Plaintiff had the RFC to perform a range of light work that included the following mental work-related limitations:

> She must avoid more than occasional hazards such as, unprotected heights and open machinery. She is limited to unskilled work of a routine, repetitive nature (reasoning levels 1-2) in two-hour segments at a non-production pace (meaning, non-automatic/non conveyor belt pacing) with infrequent changes in the work setting. In addition, she is limited to occasional contact with the public, frequent contact with supervisors and co-workers but the work should not require teamwork or tandem work for task completion, and no conflict resolution or crisis management.

(Tr. 19). The ALJ reached this assessment by thoroughly reviewing the relevant evidence and providing a detailed explanation of how the evidence supported his finding. (Tr. 18–24). While the ALJ determined that Plaintiff's mental impairments could reasonably be expected to cause some of her alleged symptoms, he found that her statements concerning the intensity, persistence, and limiting effects of those symptoms were not consistent with the entire record.

(Tr. 20). In determining Plaintiff's RFC, the ALJ duly considered the entire record, including Plaintiff's statements to her medical providers, Dr. Reddick's treatment notes and opinions, Dr. Ritterspach's psychological consultative examination, and the prior administrative medical findings from Drs. Herrera and Harrison. (Tr. 18–24).

As noted, Plaintiff's sole argument is that the ALJ did not articulate his reasons for finding Dr. Reddick's medical opinions in the July 2020 letter were not persuasive.[3] But the ALJ did do exactly that. In his opinion, he spent a full paragraph explaining why neither the record nor Dr. Reddick's own treatment notes supported the opinions in the July 2020 letter. The ALJ noted that Dr. Reddick's treatment records provided scant information with significant gaps in treatment. (Tr. 21). The records generally showed Plaintiff had issues with anxiety and vegetative thoughts related to her body dysmorphia, low confidence, and an eating disorder. (Tr. 21). Still, Dr. Reddick's "mental status examinations with the exception of mood and, abnormal thoughts on occasion, [are] essentially normal."[4] Specifically, Dr. Reddick consistently found her

---

[3] Because Plaintiff filed her disability claim after March 27, 2017, a revised regulatory framework applied to the ALJ's evaluation of the medical evidence in her case. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5,844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132-01 (Mar. 27, 2017)). The revised regulations eliminate what has been referred to as the "treating source rule" (i.e., the need to give special deference or possibly controlling weight to a medical opinion from a treating source) and stipulate that factors related to the substance of medical opinions—supportability and consistency—are the most important (rather than the previous emphasis on the source's relationship with the claimant). See id.; compare 20 C.F.R. §§ 416.920b, 416.920c with 20 C.F.R. § 416.927. The ALJ correctly applied the revised regulatory framework in addressing Plaintiff's claim.

[4] Plaintiff criticizes the ALJ for "mistat[ing] the evidence of record" by finding Plaintiff had "'essentially normal mental status examination[s];'" Plaintiff argues her treatment notes show "repeatedly abnormal mood, affect, thought process and attention/concentration." (Pl. Br. at 11). Contrary to Plaintiff's 'misstatement' contention, the ALJ's statement explicitly caveated Plaintiff's mood (mood is combined with affect in Dr. Reddick's checkbox form) and abnormal thoughts when he described the normality of the mental status examinations. (Tr. 21). And while Plaintiff contends her thought processes and attention/concentration have been "repeatedly

-10-

Case 3:22-cv-00274-MOC   Document 18   Filed 06/09/23   Page 10 of 16

orientation, appearance, motor/behavior, associations, memory, and thought process were all within normal limits, and her fund of knowledge, judgment, and insight were consistently found age appropriate. (Id.). The ALJ also found that Dr. Reddick's statements in his February 2020 (in which Dr. Reddick recommended an emotional support animal for Plaintiff) regarding the severity of Plaintiff's depression and anxiety and the resulting functional limitations were not supported by his treatment notes. (Tr. 22–23). Moreover, the ALJ pointed out that while the treatment notes substantiated Plaintiff's depression and anxiety predominantly associated with her body dysmorphia, they did not support the attested dissociative symptoms, volatile anxiety, severe emotional dips, memory problems, and problems with concentrating or focusing. See (Tr. 21, 23). The ALJ explained that "it would be reasonable to expect that if the claimant experienced the severe symptoms and functional limitations that Dr. Reddick attests to, he would have recorded them in his medical records." (Tr. 23).

To the extent Dr. Reddick described Plaintiff as one of the most challenging cases he had seen, the ALJ observed that Dr. Reddick's

> fairly terse treatment records do not support or provide much detail in terms of that challenge nor do his mental health records provide any limitations beyond those in the claimant's residual functional capacity assessment above. Accordingly, the undersigned finds Dr. Reddick's letter unpersuasive.

(Tr. 23).

---

abnormal," Pl. Br. at 11, that is inaccurate. Over the course of approximately three years of treatment, her thought processes were found to be abnormal on two occasions. (Tr. 404, 528), and her attention/concentration has only been found distracted at three appointments, (Tr. 487, 488, 490), and generally abnormal at one appointment, (Tr. 528). Plaintiff also contends the ALJ misstates the record by finding that Plaintiff's memory is consistently within normal limits; Plaintiff cites a single appointment in support, which showed decreased short-term memory. (Pl. Br. 11). The ALJ's statement is accurate because her memory was consistently found within normal limits. (Tr. 405, 406, 408, 409, 411, 487, 489, 490, 528, 529, 530, 531).

The treatment notes confirm the ALJ's statement that Dr. Reddick's opinions are not supported. During the relevant period, the frequency of Dr. Reddick's appointments was approximately one every two to three months; the length of the appointments was an hour or less; and there was neither a hospitalization nor a recommendation for hospitalization (Tr. 404–11, 487–90, 528–31). The treatment was thus "routine, outpatient care," as the ALJ noted. (Tr. 23).

Dr. Reddick's notes also establish that Plaintiff's behavior and appearance were consistently normal (Tr. 404, 405, 406, 408, 410, 411, 487, 488, 489, 490, 528, 529, 530, 531); her speech, associations, and thought processes were normal (Tr. 405, 406, 408, 409, 410, 411, 487, 488, 489, 490, 529, 530, 531); her judgment and insight were age appropriate (Tr. 404, 405, 406, 408, 409, 410, 411, 487, 488, 490, 528, 529, 530, 531); and her memory, attention, concentration, and fund of knowledge were typically normal (Tr. 405, 406, 408, 409, 410, 489, 529, 530, 531).

During the relevant period, Plaintiff only showed a decrease in short-term memory at one appointment. (Tr. 404). During the same period, her attention and concentration were only noted as distracted at three appointments, and generally abnormal in one other. (Tr. 487, 488, 490, 528). By contrast, Plaintiff's entire examination was noted as being normal, including the categories for mood, affect, and thought content, in a few instances. (Tr. 405, 410). The treatment notes thus show that Dr. Reddick's mental examinations were generally normal, apart from Plaintiff's mood/affect and abnormal thoughts, precisely as the ALJ stated in his RFC analysis.

In addition, the ALJ considered Dr. Ritterspach's consultative examination and found it mostly persuasive. (Tr. 22). Specifically, the ALJ agreed with Dr. Ritterspach's opinions that

Plaintiff was only mildly impaired in her ability to understand, retain, and follow instructions; mildly to moderately limited in her ability to sustain attention to perform simple, repetitive tasks; and moderately to significantly impaired in relating to others, including co-workers and supervisors. (Id.). The ALJ was not persuaded by Dr. Ritterspach's opinion that Plaintiff was significantly impaired with her ability to handle stress and pressures associated with work activities. (Id.). He explained that Dr. Ritterspach did not define what a "significant" impairment connoted. (Id.). The ALJ also found the record evidence did not support a disabling level of stress intolerance because it was inconsistent with the mild limitations in understanding and following instructions, the mild-to-moderate limitation in attention and concentration, and the moderate limitation in social interaction. (Id.). As the ALJ pointed out, during the relevant period Plaintiff had no mental health hospitalizations or treatment other than counseling sessions with Dr. Reddick. (Id.).

The ALJ also considered the prior administrative medical findings from Drs. Herrera and Harrison. (Id.). In particular, the ALJ found their opinions persuasive with regard to Plaintiff's ability to sustain attention for simple, routine, repetitive tasks; accept direction from supervisors and maintain adequate working relationships with coworkers; and function in a stable work environment. (Id.).

Finally, the ALJ considered the third-party function report and witness statement provided by Plaintiff's mother. (Id.). He considered her statements regarding Plaintiff's claimed symptoms, daily activities, alleged limitations, and observations, and considered those statements in the context of the other medical evidence. (Id.). Based on his consideration of the entire record, the ALJ explained that Plaintiff was able to perform a range of light work, but she should be limited to unskilled work of a routine, repetitive nature (reasoning levels 1 and 2) in two-hour

segments, and further limited to jobs involving the understanding, remembering, and carrying out of simple instructions. (Tr. 18, 19, 21–22). Also, the ALJ found she could adequately relate to people in the workplace, but should be limited to frequent interaction with co-workers and supervisors, no teamwork or tandem work, and only occasional interaction with the public. (Id.). Regarding her issues with sustaining concentration and tolerating stress, the ALJ determined she could stay on task in two-hour increments, with normal breaks, should not perform tasks at a production pace, should have only infrequent changes in work setting, and should not be involved in conflict resolution or crisis management. (Id.).

The ALJ also articulated how Dr. Reddick's opinions contrasted with the consultative examination and prior administrative medical findings, and were therefore not consistent with the record. (Tr. 18–19, 22–23). See Keene v. Berryhill, 732 Fed. App'x 174, 177 (4th Cir. 2018) (finding the court "must read the ALJ's decision as a whole" and that findings in one step can support findings in other steps of the analysis). The ALJ explained that Drs. Ritterspach, Herrera, and Harrison all agreed that Plaintiff had the capacity to understand, remember, and carry out instructions; she retained a sufficient ability to maintain socially appropriate behavior, to get along with co-workers and peers, and to take instructions and criticism from supervisors; she could sustain sufficient attention and concentration to perform simple, routine, repetitive tasks and stay on task for two-hour intervals with normal breaks, so long as the work was not teamwork, tandem work, or work performed at a production pace; and she could respond appropriately to infrequent changes in the work setting and adequately set goals and make plans independently. (Tr. 18–19, 22–23). When the ALJ's decision is read as a whole, Dr. Reddick's medical opinions were found to be inconsistent with the other relevant evidence—regarding Plaintiff's mental work-related limitations—from Drs. Ritterspach, Herrera, and Harrison.

The ALJ thus reasonably determined that Dr. Reddick's medical opinions were not consistent with the entire record nor supported by his treatment notes. See 20 C.F.R. §§ 416.920c(b)(2), (c)(1)-(2).

An ALJ errs only when the reviewing court is "left to guess about how the ALJ arrived at his conclusions." See Mascio v. Colvin, 780 F.3d 632, 637 (4th Cir. 2015). So long as a "logical bridge" connects the evidence to the ALJ's conclusions, the ALJ's obligation is satisfied. See, e.g., Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016). In other words, where "the agency's path may reasonably be discerned," the Court will not "upset" an administrative decision. Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 497 (2004) (internal citation omitted); see also Garland v. Dai, 141 S. Ct. 1669, 1679 (2021).

Because the ALJ duly articulated his reasons for finding Dr. Reddick's opinions not persuasive, including their lack of supportability and consistency, a logical bridge connects the evidentiary record to the ALJ's conclusion. Monroe, 826 F.3d at 189. The ALJ's rationale is thus readily discerned, and his decision is supported by substantial evidence. Dai, 141 S. Ct. at 1679; Alaska Dep't of Envtl. Conservation, 540 U.S. at 497.

### VI.   Conclusion

The Court has carefully reviewed the decision of the ALJ, the transcript of the proceedings, Plaintiff's motion and brief, the Commissioner's responsive pleading, and Plaintiff's assignments of error. Review of the entire record reveals that the decision of the ALJ is supported by substantial evidence. Finding that there was "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Richardson, 402 U.S. at 401, Plaintiff's Motion for Summary Judgment will be denied, the Commissioner's Motion for Summary Judgment will be granted, and the decision of the Commissioner will be affirmed.

## ORDER

**IT IS, THEREFORE, ORDERED** that:

(1) The decision of the Commissioner, denying the relief sought by Plaintiff, is **AFFIRMED**;

(2) Plaintiff's Motion for Summary Judgment, (Doc. No. 13) is **DENIED**;

(3) The Commissioner's Motion for Summary Judgment, (Doc. No. 17) is **GRANTED**; and

(4) This action is **DISMISSED.**

Signed: June 9, 2023

Max O. Cogburn Jr
United States District Judge